UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION
_____

DEMARCO R. BRADBURY,

                Plaintiff,

v.

PATRICIA LEWIS,

                Defendant.

_____/

Case No. 2:23-cv-238

Honorable Maarten Vermaat

## OPINION

This is a civil rights action brought by a state prisoner under 42 U.S.C. § 1983. The Court has granted Plaintiff leave to proceed *in forma pauperis* in a separate order. Pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure, Plaintiff consented to proceed in all matters in this action under the jurisdiction of a United States magistrate judge. (ECF No. 5, PageID.136.)

Plaintiff's complaint is presently before the Court for preliminary review under the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (1996) (PLRA), pursuant to 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c). The Court is required to conduct this initial review prior to the service of the complaint. *See In re Prison Litig. Reform Act*, 105 F.3d 1131, 1131, 1134 (6th Cir. 1997); *McGore v. Wrigglesworth*, 114 F.3d 601, 604–05 (6th Cir. 1997). Service of the complaint on the named defendant is of particular significance in defining a putative defendant's relationship to the proceedings.

"An individual or entity named as a defendant is not obliged to engage in litigation unless notified of the action, and brought under a court's authority, by formal process." *Murphy Bros.,*

*Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 347 (1999). "Service of process, under longstanding tradition in our system of justice, is fundamental to any procedural imposition on a named defendant." *Id.* at 350. "[O]ne becomes a party officially, and is required to take action in that capacity, only upon service of a summons or other authority-asserting measure stating the time within which the party served must appear and defend." *Id.* (citations omitted). That is, "[u]nless a named defendant agrees to waive service, the summons continues to function as the *sine qua non* directing an individual or entity to participate in a civil action or forgo procedural or substantive rights." *Id.* at 351. Therefore, the PLRA, by requiring courts to review and even resolve a plaintiff's claims before service, creates a circumstance where there may only be one party to the proceeding—the plaintiff—at the district court level and on appeal. *See, e.g.*, *Conway v. Fayette Cnty. Gov't*, 212 F. App'x 418 (6th Cir. 2007) ("Pursuant to 28 U.S.C. § 1915A, the district court screened the complaint and dismissed it without prejudice before service was made upon any of the defendants . . . [such that] . . . only [the plaintiff] [wa]s a party to this appeal.").

Here, Plaintiff has consented to a United States magistrate judge conducting all proceedings in this case under 28 U.S.C. § 636(c). That statute provides that "[u]pon the consent of the parties, a full-time United States magistrate judge . . . may conduct any or all proceedings . . . and order the entry of judgment in the case . . . ." 28 U.S.C. § 636(c). Because the named Defendant has not yet been served, the undersigned concludes that she is not presently a partys whose consent is required to permit the undersigned to conduct a preliminary review under the PLRA, in the same way she is not a party who will be served with or given notice of this opinion. *See Neals v. Norwood*, 59 F.3d 530, 532 (5th Cir. 1995) ("The record does not contain a

consent from the defendants[; h]owever, because they had not been served, they were not parties to this action at the time the magistrate entered judgment.").[1]

Under the PLRA, the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c). The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). Applying these standards, the Court will dismiss Plaintiff's complaint for failure to state a claim.

## <u>Discussion</u>

### I.    Factual allegations

Plaintiff is presently incarcerated with the Michigan Department of Corrections (MDOC) at the Baraga Correctional Facility (AMF) in Baraga, Baraga County, Michigan. The events about which he complains occurred at that facility.

Plaintiff is serving a sentence of 3 years, 10 months to 15 years imprisonment for threatening or intimidating a witness, in violation of Mich. Comp. Laws § 750.122. *See* MDOC Offender Tracking Information System, https://mdocweb.state.mi.us/otis2/otis2profile.aspx? mdocNumber=246508 (last visited Mar. 5, 2024). During his incarceration for that offense, on

---

[1] *But see Coleman v. Lab. & Indus. Rev. Comm'n of Wis*., 860 F.3d 461, 471 (7th Cir. 2017) (concluding that, when determining which parties are required to consent to proceed before a United States magistrate judge under 28 U.S.C. § 636(c), "context matters" and the context the United States Supreme Court considered in *Murphy Bros.* w as nothing like the context of a screening dismissal pursuant to 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c)); *Williams v. King*, 875 F.3d 500, 503–04 (9th Cir. 2017) (relying on Black's Law Dictionary for the definition of "parties" and not addressing *Murphy Bros*.); *Burton v. Schamp*, 25 F.4th 198, 207 n.26 (3d Cir. 2022) (premising its discussion of "the term 'parties' solely in relation to its meaning in Section 636(c)(1), and . . . not tak[ing] an opinion on the meaning of 'parties' in other contexts").

May 22, 2020, Plaintiff assaulted a prison employee, in violation of Mich. Comp. Laws § 750.197c. He is serving a consecutive sentence of 2 months, 17 days to 5 years for that offense.

Plaintiff sues AMF Nurse Practitioner Patricia Lewis. The crux of Plaintiff complaint is that he has been suffering neck and shoulder pain for an extended period of time and that Defendant Lewis has been a central figure in denying treatment for those conditions. Plaintiff's fifteen-page handwritten complaint is not a model of clarity. The narrative is not presented chronologically. Plaintiff's factual allegations begin on PageID.7 and end on PageID10. (Compl., ECF No. 1, PageID.7–10.) The facts offered are not particularly revealing. Considering only Plaintiff's factual allegations, he has failed to state any federal claim against Defendant Lewis

But the Court is not limited to Plaintiff's scant factual allegations. Plaintiff provides more than 100 pages of documents in support of his complaint. Those documents provide detail that is necessary to understand Plaintiff's handwritten allegations. The principle underlying the organization of the documents is also a mystery; it is certainly not chronological.

The Court may consider documents that are attached to a *pro se* complaint when considering whether the complaint states a claim upon which relief should be granted. *See, e.g.*, *Powell v. Messary*, 11 F. App'x 389, 390 (6th Cir. 2001) (affirming the Eastern District of Michigan's consideration of the attachments to plaintiff's complaint to determine that the plaintiff had received medical treatment and, therefore, failed to state a claim under the Eighth Amendment); *Hardy v. Sizer*, No. 16-1979, 2018 WL 3244002 (6th Cir. May 23, 2018) (affirming this Court's consideration of the plaintiff's complaint allegations and the documents attached to the complaint to support the determination that the plaintiff failed to state a claim); *Hogan v. Lucas*, No. 20-4260, 2022 WL 2118213, at *3 n.2 (6th Cir. May 20, 2022) (stating that "[b]ecause the documents attached to Hogan's complaint are referenced in the complaint and 'central to the claims

4

contained therein,' they were properly considered at the § 1915(e)(2) screening stage" (citations omitted)). In considering the documents, the Court accepts as true Plaintiff's statements set forth in the grievances and the medical record documents. Although the Court would not typically accept as true the statements of the healthcare providers or the grievance responders, in this instance, those statements are often not inconsistent with the facts reported by Plaintiff. Nonetheless, in the same way Court would not accept as true conclusory statements that medical care provided was inadequate, the Court will also not accept as true any conclusory statements of the grievance responders that the care provided was adequate.

Reorganizing Plaintiff's documents and reviewing them in chronological order reveals the long and painful course of treatment for his neck and shoulder. The first mention of Plaintiff's shoulder pain appears in an August 31, 2021, response to one of Plaintiff's medical kites. (ECF No. 1-1, PageID.64.) Another such response from January 4, 2022, notes that the pain is moving to the side of Plaintiff's neck. (*Id.*, PageID.67.) None of these communications involve Defendant Lewis.

It is apparent that Plaintiff was offered medication to treat his neck pain because on February 4, 2022, he filed a grievance complaining that the medication was prescribed on an "as needed" basis so that he had to ask for it rather than just having it delivered automatically each day. (*Id.*, PageID.35.) The grievance response indicates that the medication was on a restricted list and that Plaintiff could not be allowed to keep it on his person. (*Id.*, PageID.34.) The response also noted that the record showed Plaintiff had received his doses when he asked for it and the only times he had missed doses were when he failed to ask for it. (*Id.*)

On May 2, 2022, a nurse responded to Plaintiff's inquiry regarding the recent MRI of his neck. He wondered about the results and when he could have an MRI of his shoulder. (*Id.*,

PageID.68.) Plaintiff contacted healthcare again by kite regarding shoulder pain on May 12, 2022;

he inquired again when he could get an MRI of his shoulder. (*Id*., PageID.69.) The responding

nurse—not Defendant Lewis—responded that his chart would be reviewed by the provider. (*Id*.)

The next contact is reflected in a kite response dated June 5, 2022. (*Id*., PageID.83.)

Plaintiff complained that he had been taken off his pain medications and he wanted to receive those

medications again. (*Id*.) The nurse responded that he had been taken off one medication because

he received a misconduct for alcohol abuse. (*Id*.) She advised him he could take another of his

prescribed medicines for pain relief. (*Id*.)

Plaintiff filed a grievance about the discontinuation of his pain medication because of the

alcohol abuse. (*Id*., PageID.28.) His grievance report reveals that it was Defendant Lewis who

advised Plaintiff his medication had been discontinued due to alcohol abuse because the

combination of alcohol and the medication could lead to coma or death. (*Id*.) Plaintiff did not deny

the alcohol abuse; he simply claimed those dire possibilities could not have occurred because he

did not receive or take his medications that day. (*Id*.)

Plaintiff's next communication, repeated in a June 23, 2022, kite response, also shows

contact with Defendant Lewis. (*Id*., PageID.82.) Plaintiff's kite complained that Nurse Lewis has

informed Plaintiff that he was not approved for lidocaine patches. (*Id*.) Plaintiff complained that

the two medications he was taking did not suffice to control his pain. (*Id*.)

Defendant Lewis sent Plaintiff a note on June 29, 2022, explaining that she had received

the report from Plaintiff's neurosurgeon regarding a proposed surgery for Plaintiff's neck. (*Id*.,

PageID.54.) Lewis noted that she had not been able to review the report right away because

Plaintiff had refused to sign a release. (*Id*.) She recommended that Plaintiff go forward with the

surgery. (*Id*.)

Defendant Lewis next communicated with Plaintiff in a note dated August 11, 2022. (*Id.*, PageID.57.) She explained that Plaintiff's neck surgery was delayed because he would not visit healthcare for a preoperative history and physical and would not take a COVID test. (*Id.*) She noted that Plaintiff had indicated that he wanted the surgery but was now putting up roadblocks. (*Id.*)

Four days later Defendant Lewis sent Plaintiff another administrative note. (*Id.*, PageID.56.) Plaintiff had apparently requested that his medication be delivered by a particular provider and that it not be provided "as needed." (*Id.*) Defendant Lewis advised that Plaintiff could not pick the person who delivered his medication and that he would have to ask the Corrections Officers to call healthcare when Plaintiff needed the medications. (*Id.*)

Plaintiff immediately complained to Nurse Lewis's "bosses" (*Id.*, PageID.39.) That note made clear that Lewis's note followed Plaintiff's attempt to have the delivering nurse come out from behind the cell door so Plaintiff could see who was delivering the medication. (*Id.*) Plaintiff also noted that he considered Lewis's prescription for pain relievers "as needed" a misuse of her authority. (*Id.*)

Plaintiff had the neck surgery on September 1, 2022. (Treatment Notes, ECF No. 1-2, PageID.113–120.) He sent a kite to healthcare a week later complaining that his pain medications were not sufficient. (ECF No. 1-1, PageID.65.) The response indicated that Plaintiff was prescribed Tylenol with Codeine and four ice packs a day. (*Id.*)

By September 12, the Tylenol with Codeine prescription had apparently ended because Plaintiff wrote a healthcare kite seeking more powerful pain medication. (*Id.*, PageID.66.) The responding nurse—not Defendant Lewis—advised Plaintiff to take over-the-counter Tylenol until an upcoming follow-up appointment with the medical provider. (*Id.*)

7

Plaintiff sent additional requests for pain medications on September 15, 2022, and October 4, 2022. (*Id.*, PageID.89, 93.) He also filed a grievance. (*Id.*, PageID.21–22.)

Defendant Lewis sent Plaintiff another administrative note on October 10, 2022. (*Id.*, PageID.63.) She advised Plaintiff that a recent ultrasound of his neck was normal and that post-surgical pain was to be expected and that he could discuss options with his surgeon at an upcoming appointment. (*Id.*)

On October 26, 2022, Plaintiff directed a healthcare kite to Defendant Lewis asking if Lewis had sought permission for an MRI of Plaintiff's shoulder. (*Id.*, PageID.95.) That same day, he sent another kite asking for an "extra pillow detail." (*Id.*, PageID.94.) Two days later, he sent another request again complaining about pain in his shoulder and neck. (*Id.*, PageID.96.) Four days later Plaintiff sent another kite reminding Defendant Lewis about the shoulder MRI. (*Id.*, PageID.70.) Three days later, on November 4, 2022, Plaintiff sent another request asking Defendant Lewis to increase his pain medication from once a day to three times a day. (*Id.*, PageID.92.) Four days later Plaintiff sent another kite requesting pain medication. (*Id.*, PageID.90.) On November 21, 2022, Plaintiff sent a kite again asking Defendant Lewis about the shoulder MRI. (*Id.*, PageID.88.) The next day, Plaintiff sent a kite explaining to Defendant Lewis that the pain in his shoulder was a different issue than the pain in his neck. (*Id.*, PageID.91.)

On December 27, 2022, Defendant Lewis reported the results of Plaintiff's shoulder MRI. (*Id.*, PageID.58.) She noted that the MRI showed tendinopathy and arthritis but that surgery would not be required. (*Id.*) Instead, anti-inflammatories, steroid injections, and a home exercise program should resolve the issue. (*Id.*)

On January 5, 2023, Plaintiff wrote a kite to Defendant Lewis advising her that he wanted to stay on gabapentin and not switch to meloxicam. (*Id.*, PageID.102.) Thus, it is apparent that at

some point Plaintiff was prescribed pain medication. Four days later, Defendant Lewis advised Plaintiff that gabapentin was not discontinued. (*Id.*, PageID.59.) Instead, she was stopping anti-inflammatories because Plaintiff complained of abdominal pain from those medications. (*Id.*)

During late February 2023, Plaintiff filed a grievance against Nurse Lewis because she had directed that Plaintiff's gabapentin be dispensed floating in water. (*Id.*, PageID.33, 34, 31–32, 50, 30.) That decision followed reports that Plaintiff had been "cheeking"[2] and selling his medication. Nurses complained that Plaintiff would not let them examine under his tongue after medications were dispensed to ensure that Plaintiff had ingested them. (*Id.*) Plaintiff appears to acknowledge that fact. (*Id.*, PageID.33.) Defendant Lewis sent Plaintiff an administrative note on March 9, 2023, explaining that because Plaintiff continued to misuse the gabapentin it was being discontinued. (*Id.*, PageID.55.)

The medical record supplied by Plaintiff then falls silent for a few months. On July 4, 2023, Plaintiff sent the first of several healthcare kites to Defendant Lewis asking to be put back on the muscle relaxers. (*Id.*, PageID.101.) Based on subsequent documents, it appears Defendant Lewis prescribed muscle relaxers for Plaintiff for 5 days. (*Id.*, PageID.80.) It appears she could not offer a longer prescription without approval from the Pain Management Committee. (*Id.*, PageID.60.) On August 7, 2023, Defendant Lewis advised Plaintiff that the committee did not approve the medication. (*Id.*, PageID.61.) The committee suggested chelated magnesium, which Lewis ordered, and she also ordered Celebrex. (*Id.*)

---

[2] "Cheeking" is prison parlance for hiding medication without ingesting it. It is often followed by the sale of the secreted drug to other prisoners, with stronger medications, such as narcotics, having a higher market value. *See, e.g.*, *Easley v. Dep't of Corr.*, 590 F. App'x 860, 865 (11th Cir. 2014); *Johnson v. Richins*, No. 10–4171, 2011 WL 3677839, at *1 (10th Cir. Aug. 23, 2011); *Maisano v. Gelabert*, 1:09–cv–99, 2011 WL 2945830, at *6 (W.D. Mich. June 27, 2011); *Jones v. Caruso*, No. 1:10–cv–812, 2011 WL 1467647, at *2 (W.D. Mich. Apr. 14, 2011).

In the weeks that followed, Plaintiff sent kites requesting the steroid shot for his shoulder and he advised healthcare that the new medications were bothering his stomach. (*Id.*, PageID.98, 76, 86, 75, 97, 74.) By administrative note dated August 30, 2023, Defendant Lewis advised Plaintiff to discontinue the chelated magnesium, she increased his duloxetine, and she suggested trying some over-the-counter pain relievers. (*Id.*, PageID.62.) Plaintiff filed a grievance regarding these medication decisions. (*Id.*, PageID.25, 24, 20, 23, 19.)

The record then falls silent again until October, when Plaintiff sent a stream of healthcare kites regarding pain in his neck, his need for muscle relaxers, and pain in his shoulder. (*Id.*, PageID.85, 73, 84, 72.) On October 27, 2023, healthcare personnel advised Plaintiff he would be receiving a pain shot that included a skeletal muscle relaxant. (*Id.*, PageID.72.) The shot was scheduled for November 2, 2023. (*Id.*, PageID.71.)

In handwritten notes dated November 9 and 10, 2023, Plaintiff reports that the shot did not occur on November 2. (*Id.*, PageID.104–107.) He received it on November 9, 2023. (*Id.*, PageID.104.)

In Plaintiff's complaint, he recounts a few of the events outlined above. The crux of his complaint, however, is that Defendant Lewis denied him pain medications or otherwise denied him treatment for his neck and shoulder. (Compl., ECF No. 1, PageID.7–8.) Plaintiff contends that Defendant Lewis's actions give rise to medical malpractice claims, racial discrimination claims, retaliation claims, conspiracy claims, deliberate indifference claims, and claims for violation of MDOC policy. (*Id.*, PageID.7, 9.) Plaintiff specifically alleges that Defendant Lewis violated Plaintiff's rights under the First, Fourth, Eighth, and Fourteenth Amendments. (*Id.*, PageID.10, 13–14.) Plaintiff also indicates that Defendant Lewis violated 42 U.S.C. §§ 1981, 1983, 1985, and 1986. (*Id.*, PageID.12.) Plaintiff contends that Defendant Lewis has violated Plaintiff's right to

10

petition the government for redress of grievances, to not be subject to egregious or arbitrary abuse of government power, to not be retaliated against for petitioning the government for redress of grievances, to not be deprived of equal protection, to not be deprived of due process, to speak freely, to not be subjected cruel and unusual punishment, and to privacy. (*Id*., PageID.13–14.)

Plaintiff seeks a declaration that Defendant violated his constitutional rights as well as hundreds of thousands of dollars in compensatory and punitive damages.

## II. Failure to state a claim

A complaint may be dismissed for failure to state a claim if it fails "to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Id.*; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679. Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470–71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(ii)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994). The requirements to state claims under the other statutory sections are set forth below.

## III.   First Amendment

Plaintiff does not separate out any of his factual allegations as the foundation for his First Amendment claims.

He does mention retaliation. (Compl., ECF No. 1, PageID.7.)

He also states the following: "Plaintiff files the instant action to redress official notorious customs, egregiously designed and infelicitous, notorious means to usurp, suppress and punish Plaintiff's exercise of Plaintiff's First Amendment Rights." (*Id.*)

And he states:

10.   Any time I put a grievance in about my medication manner, N.P. Patricia Lewis will discontinuing my medication she will make something up and lie saying I misuse the medication telling me to purchase medications from store that don't work for my medical issues. I put a grievance in on medical, on 2-22-2023. I get a response back on 3-3-2023 telling me medication administration said my meds was to be continued. On 3-9-2023, she discontinued the meds I was on abusing her authority.

(*Id.*, PageID.9–10 (grammar in original).)

Finally, Plaintiff alleges:

24.   Defendant's actions have forced Plaintiff to be in a continual state of fear whenever plaintiff attempts to file a grievance or letter or complaint exercising Plaintiff's First Amendment rights.

12

25.     Defendant's actions were designed to, or allowed to suppress, oppress, usurp, punish, and retaliate against Plaintiff's actions of petitioning the government for redress.

26.     The conduct of the Defendants each have deprived Plaintiff of the following rights, privileges, and immunities secured by the Constitution of the United States:

(A.) The right of Plaintiff to meaningfully petition the government for redress of grievances as secured by the First Amendment to the U.S. Constitution.

* * *

(C.) The right not to be subjected to retaliation for petitioning the government for redress of grievance in violation of the First Amendment to the U.S. Constitution.

* * *

(F)     The right of freedom of speech as secured by the First Amendment to the U.S. Constitution.

(*Id.*, PageID.12–14.)

### A.     Retaliation

Retaliation based upon a prisoner's exercise of his or her constitutional rights violates the Constitution. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). In order to set forth a First Amendment retaliation claim, a plaintiff must establish three elements: (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated, at least in part, by the protected conduct. *Id.* Moreover, a plaintiff must be able to prove that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct. *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

Plaintiff's description of the events, though conclusory, roughly matches the three elements: Defendant Lewis threatened to discontinue Plaintiff's gabapentin, he filed a grievance,

(ECF No. 1-1, PageID.33), the grievance response indicated that he could continue on the gabapentin, but Defendant Lewis discontinued the gabapentin anyway. From Plaintiff's perspective, filing the grievance was protected conduct, discontinuing the medication was adverse action, and the motivation is apparent in the temporal proximity between those two events.

The filing of a nonfrivolous prison grievance is constitutionally protected conduct for which a prisoner cannot be subjected to retaliation. *See Smith*, 250 F.3d at 1037); *Herron v. Harrison*, 203 F.3d 410, 415 (6th Cir. 2000). But Plaintiff's description of the events leading to the filing of the grievance are conveniently incomplete. Nurse Lewis had informed Plaintiff that the medication would be discontinued if he continued to give the dispensing nurses trouble with regard to the medication being dispensed floating in water or with regard to lifting his tongue to demonstrate that he had ingested the medication. Plaintiff's grievance makes clear that he objected to both of those practices and that dispensing nurses had reported his lack of cooperation.

Plaintiff alleges that the Step I grievance response advised him that the medication was to be continued. (Compl., ECF No. 1, PageID.10.) That is accurate, but again conveniently incomplete. In fact, the Step I response, authored by Jamie Monville, the health unit supervisor and reviewed by Aaron Jeffrey, the health unit manager (ECF No. 1-1, PageID.31), actually stated exactly what Nurse Lewis had told Plaintiff – that nurses had reported that Plaintiff was diverting his medication and would not let them examine under his tongue when he took the medication.[3] The response concludes: "It is advised that you cooperate with all of the nurses and follow the mandatory mouth checks that are required by direct observation . . . for this medication to be continued." (*Id.*)

---

[3] Plaintiff's response to those allegations was not a complete denial. Instead, Plaintiff reported that he did not have any misconducts for selling medication and that he did not have any misconducts for behaving inappropriately when asked to show under his tongue. (ECF No. 1-1, PageID.30.)

14

Accepting Plaintiff's version of the Step I grievance response's conclusion—that the medication was to be continued despite Defendant Lewis's concerns—Nurse Lewis's discontinuation of the medicine a few days later has all the earmarks of an adverse action motivated by a grievance response that was unfavorable to Defendant Lewis. Considering the grievance response as it was actually written, however, supports an entirely different outcome.

First, the grievance response supported Defendant Lewis's warning to Plaintiff that his gabapentin would be discontinued if he failed to cooperate with the nurses. If, in fact, Plaintiff thereafter failed to cooperate with the nurses, the discontinuation of his medication could not be characterized as an "adverse action"—an act that would deter a person of ordinary firmness from engaging in protected conduct. To the contrary, from Defendant Lewis's perspective, it would actually be compliance with the direction of her superiors, and, from Plaintiff's perspective, it would be the expected follow-through on a warning that preceded the grievance.

In the interim, after the grievance was filed but before it had worked its way through the second step, a nurse reported that Plaintiff had "refus[ed] to follow proper medication pass protocol." (*Id.*, PageID.30.) Shortly thereafter, the medication was discontinued. Under that circumstance, the discontinuation of the medication cannot be considered "adverse action" and there is nothing to support an inference that Nurse Lewis was motivated by Plaintiff's filing of the grievance.

Plaintiff's allegations offer conclusory support for a First Amendment retaliation claim. Those allegations are based on an untenable reading of the documents Plaintiff attaches to the complaint. In *Williams v. CitiMortgage, Inc.*, 498 F. App'x 532 (6th Cir. 2012), the Sixth Circuit provided guidance regarding inconsistencies between complaint allegations and documents attached to the complaint:

"[W]hen a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations." *N. Indiana Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 454 (7th Cir.1998). *See, generally, In re Nat'l Century Fin. Enter., Inc., Inv. Litig.*, 604 F.Supp.2d 1128, 1157 (S.D.Ohio 2009) (citing *Fayetteville Investors v. Commercial Builders, Inc*., 936 F.2d 1462, 1465 (4th Cir.1991) ( "[I]n the event of conflict between the bare allegations of the complaint and any [attached] exhibit . . . the exhibit prevails.")); *In re Livent, Inc. Noteholders Secs. Litig.*, 151 F.Supp.2d 371, 405–06 (S.D.N.Y.2001) ("[A] court need not feel constrained to accept as truth conflicting pleadings that make no sense, or that would render a claim incoherent, or that are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely, or by facts of which the court may take judicial notice."). "Indeed, if a factual assertion in the pleadings is inconsistent with a document attached for support, the Court is to accept the facts as stated in the attached document," *see Nat'l Assoc. of Minority Contractors, Dayton Chapter v. Martinez*, 248 F.Supp.2d 679, 681 (S.D.Ohio 2002), and is "not bound to accept as true a legal conclusion couched as a factual allegation." [*Bell Atlantic Corp. v*.] *Twombly*, 550 U.S. [544] at 555 [127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ]

*Id*. at 536 (quoting with approval the district court's opinion, *Williams v. CitiMortgage, Inc*., No. 2:08–CV–368, 2011 WL 1303257, at *1–2 (S.D.Ohio Mar. 31, 2011)); *see also Croce v. New York Times Co.*, 930 F.3d 787, 792 (6th Cir. 2019) (stating "if a factual assertion in the pleadings is inconsistent with a document attached for support, a court is not bound to accept as true the plaintiff's factual allegation" (quoting *Williams*, 498 F. App'x at 536) (internal quotation marks omitted)); *Cates v. Crystal Clear Technologies, LLC*, 874 F.3d 530, 536 (6th Cir. 2017) (stating "The law is clear that [courts] may consider [a document] which was attached to the [c]omplaint . . . in determining whether dismissal is proper. Further, [w]hen a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations." (quoting *Williams*, 498 F. App'x at 536) (internal quotation marks and citations omitted))

With regard to Plaintiff's allegations that the Step I grievance responders directed the continuation of Plaintiff's medication without qualification and his allegation that Defendant Lewis's subsequent discontinuation of the medicine was inconsistent with the Step I grievance response, the Court concludes that the documents attached to the complaint contradict and trump

16

the allegations. Moreover, the contradicting facts in the documents are fatal to Plaintiff's retaliation claim. Even if Defendant Lewis's discontinuation of the medicine could be considered "adverse action" under the circumstances, neither Plaintiff's allegations nor the documents include facts that support an inference that Defendant Lewis's action was retaliation for Plaintiff's grievance.

It is well recognized that "retaliation" is easy to allege and that it can seldom be demonstrated by direct evidence. *See Harbin-Bey v. Rutter*, 420 F.3d 571, 580 (6th Cir. 2005); *Murphy v. Lane*, 833 F.2d 106, 108 (7th Cir. 1987). "[A]lleging merely the ultimate fact of retaliation is insufficient." *Murphy*, 833 F.2d at 108. "[C]onclusory allegations of retaliatory motive 'unsupported by material facts will not be sufficient to state . . . a claim under § 1983.'" *Harbin-Bey*, 420 F.3d at 580 (quoting *Gutierrez v. Lynch*, 826 F.2d 1534, 1538–39 (6th Cir. 1987)); *see also Murray v. Unknown Evert*, 84 F. App'x 553, 556 (6th Cir. 2003) (holding that in complaints screened pursuant to 28 U.S.C. § 1915A, "[c]onclusory allegations of retaliatory motive with no concrete and relevant particulars fail to raise a genuine issue of fact for trial" (internal quotation marks omitted)); *Lewis v. Jarvie*, 20 F. App'x 457, 459 (6th Cir. 2001) ("[B]are allegations of malice on the defendants' parts are not enough to establish retaliation claims [that will survive § 1915A screening]." (citing *Crawford-El v. Britton*, 523 U.S. 574, 588 (1998))).

Plaintiff merely alleges the ultimate fact of retaliation in this action.[4] He has not presented any facts to support his conclusion that Defendant Lewis retaliated against him because he filed a grievance. Defendant Lewis was just one step away from stopping the gabapentin when Plaintiff filed the grievance. In fact, that was why Plaintiff filed the grievance. To slide a grievance in between the threat to impose a consequence for future misbehavior and the eventual misbehavior

---

[4] Indeed, Plaintiff really only mentions the word—that Defendant Lewis acted "retaliatorily." (Compl., ECF No. 1, PageID.7.)

does not support an inference that the consequence was imposed because of the grievance. Accordingly, his speculative allegation fails to state a claim.

### B.      Right to Petition for Redress of Grievances

It may be that Plaintiff's repeated references to his right to petition for redress of grievances is simply a restatement of the retaliation claim considered above. Nonetheless, to the extent Plaintiff intended to raise a separate claim attacking Defendant Lewis's role in denying or otherwise interfering with the processing of Plaintiff's grievances, the Court will consider that claim as well.

Mishandling or interfering with an administrative grievance is not active unconstitutional behavior. First, interference with the grievance remedy does not violate due process because Plaintiff has no due process right to file a prison grievance. The courts repeatedly have held that there exists no constitutionally protected due process right to an effective prison grievance procedure. *See Hewitt v. Helms*, 459 U.S. 460, 467 (1983); *Walker v. Mich. Dep't of Corr.*, 128 F. App'x 441, 445 (6th Cir. 2005); *Argue v. Hofmeyer*, 80 F. App'x 427, 430 (6th Cir. 2003); *Young v. Gundy,* 30 F. App'x 568, 569–70 (6th Cir. 2002); *see also Antonelli v. Sheahan*, 81 F.3d 1422, 1430 (7th Cir. 1996); *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994) (collecting cases). Michigan law does not create a liberty interest in the grievance procedure. *See Olim v. Wakinekona*, 461 U.S. 238, 249 (1983); *Keenan v. Marker*, 23 F. App'x 405, 407 (6th Cir. 2001); *Wynn v. Wolf*, No. 93-2411, 1994 WL 105907, at *1 (6th Cir. Mar. 28, 1994). Because Plaintiff has no liberty interest in the grievance process, Defendant Lewis could not deprive Plaintiff of due process if she somehow interfered with the grievance process.

Moreover, Defendant Lewis's actions (or inactions) with regard to the grievance process could not constitute a violation of the First Amendment right to petition the government. The First Amendment "right to petition the government does not guarantee a response to the petition or the

right to compel government officials to act on or adopt a citizen's views." *Apple v. Glenn*, 183 F.3d 477, 479 (6th Cir. 1999); *see also Minn. State Bd. for Cmty. Colls. v. Knight*, 465 U.S. 271, 285 (1984) (holding the right to petition protects only the right to address government; the government may refuse to listen or respond).

Additionally, in unpublished decisions, the Sixth Circuit has held that a prisoner's allegation that a defendant improperly denied, or responded to, a grievance is not a claim of constitutional dimension because there is "no inherent constitutional right to an effective prison grievance procedure." *See Overholt v. Unibase Data Entry, Inc.*, No. 98-3302, 2000 WL 799760, at *3 (6th Cir. June 14, 2000); *Lyle v. Stahl*, No. 97-2007, 1998 WL 476189, at *1 (6th Cir. Aug. 3, 1998); *see also Wynn*, 1994 WL 105907, at *1 (discussing that there is no constitutional right to a grievance procedure).

Finally, Plaintiff has not been barred from all means of petitioning the government for redress of grievances. Even if Plaintiff had been improperly prevented from filing a grievance, his right of access to the courts to petition for redress of his grievances (i.e., by filing a lawsuit) cannot be compromised by his inability to file institutional grievances, and he therefore cannot demonstrate the actual injury required for an access-to-the-courts claim. *See, e.g.*, *Lewis v. Casey*, 518 U.S. 343, 355 (1996) (requiring actual injury); *Bounds v. Smith*, 430 U.S. 817, 821–24 (1977). The exhaustion requirement only mandates exhaustion of *available* administrative remedies. *See* 42 U.S.C. § 1997e(a). If Plaintiff were improperly denied access to the grievance process, the process would be rendered unavailable, and exhaustion would not be a prerequisite for initiation of a civil rights action. *See Ross v. Blake*, 578 U.S. 632, 640–44 (2016) (reiterating that, if the prisoner is barred from pursuing a remedy by policy or by the interference of officials, the

grievance process is not available, and exhaustion is not required); *Kennedy v. Tallio*, 20 F. App'x 469, 470–71 (6th Cir. 2001).

For all of these reasons, Plaintiff has failed to state any claim that Defendant Lewis violated Plaintiff's right to petition the government for redress of grievances.

### C.      Freedom of Speech

The Supreme Court has held that "a prison inmate retains [only] those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974). Prisoners' free speech rights are "uncontrovertedly limited by virtue of [their] incarceration." *Thaddeus-X*, 175 F.3d at 393. Prison officials may impinge on these constitutional rights if the regulation "is reasonably related to legitimate penological interests." *See Turner v. Safley*, 482 U.S. 78, 89 (1987).

This is not a case where a prisoner contends his free speech rights have been infringed by a prison regulation. In fact, it is difficult to discern what sort of free speech case this might be. Plaintiff alleges no facts to support his conclusory statement that Defendant Lewis deprived Plaintiff of his free speech rights. A § 1983 claim "cannot be founded upon conclusory, vague or general allegations, but must instead, allege facts that show the existence of the asserted constitutional rights violation recited in the complaint and what *each* defendant did to violate the asserted right." *Terrance v. Northville Reg'l Hosp.*, 286 F.3d 834, 842 (6th Cir. 2002) (emphasis in original). Plaintiff's allegations regarding violation of his free speech rights do not meet this standard. Accordingly, he has failed to state a claim for violation of his free speech rights.

## IV.     Fourth Amendment

At the end of his complaint, Plaintiff notes that Defendant Lewis has deprived him of "[t]he right to privacy as secured by the Fourth Amendment to the U.S. Constitution." (Compl., ECF

No. 1, PageID.14.) In *Hudson v. Palmer*, 468 U.S. 517 (1984), the Court considered the scope of Fourth Amendment protection afforded to a prisoner's privacy rights in his cell. The Court held "that society is not prepared to recognize as legitimate any subjective expectation of privacy that a prisoner might have in his prison cell . . . ." *Id.* at 526. But "*Hudson* did not extinguish a prisoner's Fourth Amendment right to bodily privacy." *Stoudemire v. Mich. Dep't of Corr.*, 705 F.3d 560, 572 n.3 (6th Cir. 2013). Although Plaintiff does not explain the nature of his privacy claim, after reviewing Plaintiff's allegations and all of the documents he provided, the Court presumes that Plaintiff contends that inspecting his mouth after he takes medication is a violation of his privacy.

The Supreme Court and the Sixth Circuit have recognized that prisoners may be subjected to strip searches and body cavity searches without individualized suspicion. *See Florence v. Bd. Of Chosen Freeholders*, 566 U.S. 318, 333–34 (2012) (rejecting the argument that correctional officials need reasonable suspicion to conduct visual body-cavity searches upon inmates at the time they are admitted to the general jail population); *Stoudemire*, 705 F.3d at 575 ("[S]uspicionless strip searches [are] permissible as a matter of constitutional law . . . ."); *see also Salem v. Mich. Dep't of Corr.*, 643 F. App'x 526, 529 (6th Cir. 2016). The body cavity searches at issue in *Florence* and other cases are usually much more intrusive that simply looking inside a prisoner's mouth to ensure he has swallowed his medication. "Like pat down and cell searches, mouth searches to verify that prisoners swallow their medication are conducted as part of regular security procedures to control contraband . . . ." *Bilal v. N.Y. State Dep't of Corr.*, No. 09 Civ. 8433 (JSR)(AJP), 2010 WL 2506988, at *16 (S.D.N.Y. June 21, 2010), *report and recommendation adopted*, (S.D.N.Y. Oct. 21, 2010), *aff'd sub nom. Bilal v. White*, 494 F. App'x 143 (2d Cir. 2012). Because the visual search of Plaintiff's mouth after he takes medication is not

a violation of his privacy, Plaintiff has failed to state a claim for violation of his Fourth Amendment rights.

## V.    Fourteenth Amendment

Plaintiff states he has been deprived of equal protection, procedural due process of law, and substantive due process as secured by the Fourteenth Amendment to the United States Constitution. (Compl., ECF No. 1, PageID.13.)

### A.    Equal Protection

Plaintiff's equal protection allegations are as follows:

V.      . . . Plaintiff claims of being medical malpractice and retaliatorily and racially discriminated against and threatened and harassed while here at Baraga prison. Because of Plaintiff's race, African-American and all Defendants are white racist staff members who work for the Michigan Department of Correction here at Baraga prison in health care. The retaliation and medical malpractice is being done on a conspiracy level as plaintiff will demonstrate to the court the facts of plaintiff's claims and Defendants was deliberate indifference . . . and being deny medical treatment . . . PAIN AND SUFFERING.

* * *

16.     Defendants Lewis are aware of the patte[r]n of racial discrimination implemented through the shield of racial discretionary use of health care se[r]vice here at Baraga Baraga, by denying me and other Afro-American medical treatment here at Baraga prison.

17.     Plaintiff is an Afro-American.

18.     Had Plaintiff not been Afro-American Defendants Lewis would not have allowed Defendants Lewis and other to continually undertake the herein stated actions.

(*Id.*, PageID.7, 11–12 (grammar and errors in original).)

The Equal Protection Clause of the Fourteenth Amendment provides that a state may not "deny to any person within its jurisdiction the equal protection of the laws," which is essentially a direction that all persons similarly situated should be treated alike. U.S. Const., amend. XIV; *City*

22

*of Cleburne v. Cleburne Living Ctr*., 473 U.S. 432, 439 (1985). The threshold element of an equal protection claim is disparate treatment. *Scarbrough v. Morgan Cnty. Bd. of Educ*., 470 F.3d 250, 260 (6th Cir. 2006). "To state an equal protection claim, a plaintiff must adequately plead that the government treated the plaintiff disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis." *Andrews v. City of Mentor*, 11 F.4th 462, 473 (6th Cir. 2021) (quoting *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011)). "'Similarly situated' is a term of art—a comparator . . . must be similar in 'all relevant respects.'" *Paterek v. Vill. of Armada*, 801 F.3d 630, 650 (6th Cir. 2015) (quoting *United States v. Green*, 654 F.3d 637, 651 (6th Cir. 2011)); *see also Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992); *Tree of Life Christian Sch. v. City of Upper Arlington*, 905 F.3d 357, 368 (6th Cir. 2018) ("A plaintiff bringing an equal protection claim must be 'similarly situated' to a comparator in 'all relevant respects.'").

Here, Plaintiff does not allege disparate treatment, only that he was treated poorly because of his race. Plaintiff offers no comparators, similarly situated or otherwise. Instead, he simply states he was discriminated against because of his race and notes that the Defendant is white. "[I]n the context of a civil rights claim, . . . conclusory allegations of unconstitutional conduct without specific factual allegations fail to state a claim." *Harden-Bey v. Rutter*, 524 F.3d 789, 796 (6th Cir. 2008) (quoting *Lillard v. Shelby Cnty. Bd. of Edu*c., 76 F.3d 716, 726 (6th Cir. 1996)). A plaintiff does not state an equal protection claim merely by alleging that the plaintiff is a member of a protected class, and the defendant is not. *See Nali v. Ekman*, 355 F. App'x 909, 913 (6th Cir. 2009). Accordingly, the Court concludes that Plaintiff has failed to state a claim for violation of his equal protection rights.

B.      **Due Process**

Plaintiff also makes passing reference to the protections of the Due Process Clause. Plaintiff states that the conduct of Defendant Lewis has deprived Plaintifff of the following rights:

(B)      The right of Plaintiff not to be subject to the egregious abuse and or arbitrary abuse of government power as secured by the 14th Amendment to the U.S. Constitution.

* * *

(E)      Deprival of "due process" of law as secured by the 14th Amendment to the U.S. Constitution.

(Compl., ECF No. 1, PageID.13.) Plaintiff's words implicate the protections of substantive and procedural due process.

"Substantive due process 'prevents the government from engaging in conduct that shocks the conscience or interferes with rights implicit in the concept of ordered liberty.'" *Prater v. City of Burnside*, 289 F.3d 417, 431 (6th Cir. 2002) (quoting *United States v. Salerno*, 481 U.S. 739, 746 (1987)). "Substantive due process . . . serves the goal of preventing governmental power from being used for purposes of oppression, regardless of the fairness of the procedures used." *Pittman v. Cuyahoga Cnty. Dep't of Child. & Fam. Servs.*, 640 F.3d 716, 728 (6th Cir. 2011) (quoting *Howard v. Grinage*, 82 F.3d 1343, 1349 (6th Cir. 1996)). "Conduct shocks the conscience if it 'violates the decencies of civilized conduct.'" *Range v. Douglas*, 763 F.3d 573, 589 (6th Cir. 2014) (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846–47 (1998)).

The Due Process Clause of the Fourteenth Amendment prohibits states from "depriv[ing] any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV. The elements of a procedural due process claim are (1) a life, liberty, or property interest requiring protection under the Due Process Clause, and (2) a deprivation of that interest (3) without adequate process. *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 611 (6th Cir. 2006). "Without a

24

protected liberty or property interest, there can be no federal procedural due process claim."
*Experimental Holdings, Inc. v. Farris*, 503 F.3d 514, 519 (6th Cir. 2007) (citing *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 579 (1972)).

The entirety of Plaintiff's substantive and procedural due process claims are quoted above. Thus, the Court concludes that Plaintiff is arguing that Defendant Lewis's denial of medical care for Plaintiff's neck and shoulder violates the substantive and procedural protections of due process. To the extent Plaintiff's claim is premised on his right to medical care, it is protected by the Eighth Amendment—which is addressed below—and not the Fourteenth Amendment. Procedural due process protection is not the type of protection afforded to the right to medical care. The Supreme Court explained the nature of that protection in *DeShaney v. Winebago Cnty. Dept. of Soc. Servs.*, 489 U.S. 189 (1989), as follows:

> . . . . [I]n certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals. In *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), we recognized that the Eighth Amendment's prohibition against cruel and unusual punishment, made applicable to the States through the Fourteenth Amendment's Due Process Clause, *Robinson v. California*, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962), requires the State to provide adequate medical care to incarcerated prisoners. 429 U.S., at 103–104, 97 S.Ct., at 290–291. We reasoned that because the prisoner is unable "'by reason of the deprivation of his liberty [to] care for himself,'" it is only "'just'" that the State be required to care for him. *Ibid.*, quoting *Spicer v. Williamson*, 191 N.C. 487, 490, 132 S.E. 291, 293 (1926).
>
> In *Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), we extended this analysis beyond the Eighth Amendment setting, holding that the substantive component of the Fourteenth Amendment's Due Process Clause requires the State to provide involuntarily committed mental patients with such services as are necessary to ensure their "reasonable safety" from themselves and others. *Id.*, at 314–325, 102 S.Ct., at 2457–2463; *see id.*, at 315, 324, 102 S.Ct., at 2457, 2462 (dicta indicating that the State is also obligated to provide such individuals with "adequate food, shelter, clothing, and medical care"). As we explained: "If it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional [under the Due Process Clause] to confine the involuntarily committed—who may not be punished at all—in unsafe conditions." *Id.*, at 315–316, 102 S.Ct., at 2457–2458; *see also Revere v. Massachusetts General Hospital*, 463 U.S. 239, 244, 103 S.Ct. 2979, 2983, 77

> L.Ed.2d 605 (1983) (holding that the Due Process Clause requires the responsible government or governmental agency to provide medical care to suspects in police custody who have been injured while being apprehended by the police).

*DeShaney*, 489 U.S. at 198–99 (footnotes omitted). The Sixth Circuit Court of Appeals has recognized that, to the extent the right to medical care is a due process right, it is "a substantive due process right . . . ." *Colson v. City of Alcoa, Tenn*., 37 F.4th 1182, 1187 (6th Cir. 2022) (citing *DeShaney*).

The fact that the right to medical care is a substantive due process right, essentially means that the state cannot avoid the obligation to provide medical care by affording a person the essential guarantees of procedural due process—notice of the intended deprivation and an opportunity to be heard. Thus, Plaintiff cannot prevail on a procedural due process claim for failure to provide medical care. Any procedural due process claim, therefore, is properly dismissed.

Moreover, convicted prisoners like Plaintiff do not need to rely on a substantive due process right with regard to medical care. They are entitled to medical care under the Eighth Amendment because a failure to provide such care would be inconsistent with contemporary standards of decency and, thus, would render their punishment cruel and unusual. Critically, "[w]here a particular [a]mendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that [a]mendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.'" *Albright*, 510 U.S. at 269 (quoting *Graham v. Connor*, 490 U.S. 386, 394 (1989)) (holding that the Fourth Amendment, not substantive due process, provides the standard for analyzing claims involving unreasonable search or seizure of free citizens, and the Eighth Amendment provides the standard for such searches of prisoners); *see also United States v. Lanier*, 520 U.S. 259, 272 n.7 (6th Cir. 1997) ("*Graham* simply requires that if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed

under the standard appropriate to that specific provision, not under the rubric of substantive due process."); *Walker v. Norris*, 917 F.2d 1449, 1455 (6th Cir. 1990) (explaining that, "plaintiff's section 1983 claim in a [deliberate indifference] case such as this must be for redress of eighth amendment, not fourteenth amendment substantive due process, rights" (citations omitted)); *O'Brien v. Mich. Dep't of Corr.*, 592 F. App'x 338, 344 (6th Cir. 2014 ) ("O'Brien's allegations concerned the denial of medical care, thus, '[t]he Eighth Amendment is the primary source of substantive protection' available to him . . . not the more generalized notion of 'substantive due process[.]'"). Because the Eighth Amendment provides an explicit textual source of protection against the alleged deliberate indifference to risks of harm, Plaintiff's substantive due process claim—if any such claim was intended—is properly dismissed.

For all of these reasons, Plaintiff's conclusory due process claims centered on Defendant Lewis's inadequate medical care fail to state a claim.

## VI.   Eighth Amendment

The Eighth Amendment prohibits the infliction of cruel and unusual punishment against those convicted of crimes. U.S. Const. amend. VIII. The Eighth Amendment obligates prison authorities to provide medical care to incarcerated individuals, as a failure to provide such care would be inconsistent with contemporary standards of decency. *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976). The Eighth Amendment is violated when a prison official is deliberately indifferent to the serious medical needs of a prisoner. *Id.* at 104–05; *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001).

Deliberate indifference may be manifested by a doctor's failure to respond to the medical needs of a prisoner, or by "prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed. Regardless of how evidenced,

27

deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983." *Estelle*, 429 U.S. at 104–05.

A claim for the deprivation of adequate medical care has an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To satisfy the objective component, the plaintiff must allege that the medical need at issue is sufficiently serious. *Id.* In other words, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm. *Id.* The objective component of the adequate medical care test is satisfied "[w]here the seriousness of a prisoner's need[] for medical care is obvious even to a lay person." *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 899 (6th Cir. 2004); *see also Phillips v. Roane Cnty.*, 534 F.3d 531, 539–40 (6th Cir. 2008). Obviousness, however, is not strictly limited to what is detectable to the eye. Even if the layman cannot see the medical need, a condition may be obviously medically serious where a layman, if informed of the true medical situation, would deem the need for medical attention clear. *See, e.g.*, *Rouster v. Saginaw Cnty.*, 749 F.3d 437, 446–51 (6th Cir. 2014) (holding that a prisoner who died from a perforated duodenum exhibited an "objectively serious need for medical treatment," even though his symptoms appeared to the medical staff at the time to be consistent with alcohol withdrawal); *Johnson v. Karnes*, 398 F.3d 868, 874 (6th Cir. 2005) (holding that prisoner's severed tendon was a "quite obvious" medical need, since "any lay person would realize to be serious," even though the condition was not visually obvious). If the plaintiff's claim, however, is based on "the prison's failure to treat a condition adequately, or where the prisoner's affliction is seemingly minor or non-obvious," *Blackmore*, 390 F.3d at 898, the plaintiff must "place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment," *Napier v. Madison Cnty.*, 238 F.3d 739, 742 (6th Cir. 2001) (internal quotation marks omitted).

The subjective component requires an inmate to show that prison officials have "a sufficiently culpable state of mind" in denying medical care. *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000). Deliberate indifference "entails something more than mere negligence," but can be "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer,* 511 U.S. at 835. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. To prove a defendant's subjective knowledge, "[a] plaintiff may rely on circumstantial evidence . . . : A jury is entitled to 'conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" *Rhinehart v. Scutt*, 894 F.3d 721, 738 (6th Cir. 2018) (quoting *Farmer*, 511 U.S. at 842)).

However, not every claim by a prisoner that he has received inadequate medical treatment states a violation of the Eighth Amendment. *Estelle*, 429 U.S. at 105. As the Supreme Court explained:

> [A]n inadvertent failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain or to be repugnant to the conscience of mankind. Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.

*Id.* at 105–06 (quotations omitted). Thus, differences in judgment between an inmate and prison medical personnel regarding the appropriate medical diagnoses or treatment are not enough to state a deliberate indifference claim. *Darrah v. Krisher*, 865 F.3d 361, 372 (6th Cir. 2017); *Briggs v. Westcomb*, 801 F. App'x 956, 959 (6th Cir. 2020); *Mitchell v. Hininger*, 553 F. App'x 602, 605 (2014). This is so even if the misdiagnosis results in an inadequate course of treatment and

considerable suffering. *Gabehart v. Chapleau*, No. 96-5050, 1997 WL 160322, at *2 (6th Cir. Apr. 4, 1997).

The Sixth Circuit distinguishes "between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976). If "a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Id.*; *see also Rouster*, 749 F.3d at 448; *Perez v. Oakland Cnty.*, 466 F.3d 416, 434 (6th Cir. 2006); *Kellerman v. Simpson*, 258 F. App'x 720, 727 (6th Cir. 2007); *McFarland v. Austin*, 196 F. App'x 410 (6th Cir. 2006); *Edmonds v. Horton*, 113 F. App'x 62, 65 (6th Cir. 2004); *Brock v. Crall*, 8 F. App'x 439, 440–41 (6th Cir. 2001); *Berryman v. Rieger*, 150 F.3d 561, 566 (6th Cir. 1998).

Setting aside all of the conclusory legal jargon in Plaintiff's complaint leaves only a few paragraphs of factual allegations regarding his medical treatment:

> 2. On 9-1-22, I had surgery on my spinal in my neck at Marquette Hospital, as the Defendant Practitioner-Patricial Lewis set it up to be done.

> 3. Now that [I] am in pain every day [I] am being denied pain medication for month and weeks at a time without my pain medication after making many request for the muscle relaxer medication I was on before and after my surger[y] because of the pain in my spinal in my neck that [is] hurting me.

> 4. I been putting in medical kite after medical kite to see what's the medication NP-Lewis gave me some different medications that hurts my stomach and don't work.

> 5. She put me on the muscle relaxer for 5-days. I told her it work. After that I was then told by NP Patricia Lewis that pain management didn't approved it they she say my surgery was a while ago it shou[l]dn't be anything wrong with me even if I do have a plate and screws in my spinal of my neck. My surgery was done 9-1-22 not that long ago and shou[l]dn't matter at all because surgeon Andrew Look MD who did my surgery told me that I may have pain issues or I might not have any and if I do like I had [I] have to put

30

a request in to receive a medication that will help me with the manner at hand. I put request in. I'm not getting call-out to medical on time like I should. I was told on 11-1-23 that I will be seen on 11-2-2023. I wasn't seen on that date, then I get a call-out for 11-7-2023. I wasn't call-out. So on 11-9-2023 I was called out to see NP Pat[r]icia Lewis. I was giving a pain shot in my left shoulder that I should be taken medication for also. I put in a medical request about my shoulder and neck a urgent request on 10-25-2023. I wasn't seen, so I then put in another request in on 10-31-2023 and on 10-27-2023 I get a kite response back from my second medical request 11-1-2023, and didn't get a call-out, saying I will be having this done on 11-2-2023 so I'm just in here in pain as a chronic patient.

\* \* \*

7.    As notice I put a medical request in on 10-25-2023 and 10-31-2023, it took them 14-days all toget[h]er to call me out to be seen both call-outs was over five business days.

\* \* \*

10.    Anytime I put a grievance in about my medication manner, NP Patricia Lewis will discontinuing my medication. She will make something up and lie saying I misuse the medication tell me to purchase medications from store that on't work for my medical issues. I put a grievance in on medical on 2-22-2023, I get a response back on 3-3-2023 telling me medication administration said my meds was to be continued, on 3-9-2023 she discontinued the meds I was on abusing her authority.

(Compl., ECF No. 1, PageID.7–10 (grammar and errors in original).)

Considering the objective prong of the deliberate indifference analysis, Plaintiff has adequately alleged that he suffers serious medical needs. His neck and shoulder problems are well-documented in the medical record.

With regard to the subjective prong, the medical record is not so clear. Plaintiff inaccurately suggests that all of his communications with healthcare staff were with Patricia Lewis. The documents he has provided indicate that many different healthcare providers responded to Plaintiff's requests. Nonetheless, there can be no question that Defendant Lewis was well aware of Plaintiff's serious medical needs. That leaves only the question of whether Defendant Lewis consciously disregarded those needs. Neither the factual allegations in the complaint nor the

31

medical record permit the inference that Defendant Lewis consciously disregarded Plaintiff's serious medical needs.

Plaintiff complains that Defendant Lewis discontinued pain medications three times: during the summer of 2022; during March of 2023, and during the summer of 2023. Plaintiff suggests that she discontinued the medications in response to his filing of grievances. That is not supported by the documents that Plaintiff attaches to the complaint. During June of 2022, Plaintiff's prescription of Robaxin was discontinued when he was found guilty of a substance abuse misconduct. The prescription was ended because the combination of alcohol and the medication could result in coma or death. (Grievance, ECF No. 1-1, PageID.28.) Plaintiff suggests that such a result would have never occurred because he did not take the drug the day he drank the alcohol. (*Id*.) Plaintiff's claim that the medication was discontinued because of the grievance is unsupportable. The medication was discontinued before Plaintiff filed the grievance. (Kite Response, ECF No. 1-1, PageID.93; Grievance, ECF No. 1-1, PageID.28.) Moreover, discontinuing a medication to eliminate a risk of coma or death does not reflect a conscious disregard of Plaintiff's serious medical needs. And Plaintiff was not left without any pain relief medication; his prescription for Nabumetone continued despite the alcohol use.

Nurse Lewis next discontinued a medication, gabapentin, during March of 2023. At that time, she discontinued the medication because Plaintiff refused to permit nurses administering the medication to inspect under his tongue. As stated then in his grievance and now in the present complaint, Plaintiff considered it to be an invasion of his privacy. Although Plaintiff's grievance preceded the discontinuation of the medication, the grievance attacked Lewis's warning that she would discontinue the medication if he continued to resist the inspections of his mouth. The grievance response made clear that Plaintiff was required to comply with the nurse's mouth check

32

to ensure he had ingested the medication. After nurses again reported Plaintiff's refusal to cooperate, the medication was discontinued. Plaintiff's attribution of the discontinuation to the grievance is not supported by the documents he has provided. Although Plaintiff now makes the blanket statement that the dispensing nurses were lying, several of his own statements in the medical record suggest there were instances where he would not permit a complete mouth inspection and other instances when he objected to the gabapentin being floated in water. Moreover, whether or not the nurses were lying when they reported Plaintiff's failure to comply with proper medication protocol, there is no suggestion that Defendant Lewis knew they were lying. Discontinuing the medication following a report of noncompliance, therefore, does not support an inference of Defendant Lewis's conscious disregard for Plaintiff's serious medical needs.

Finally, Plaintiff complains that during July of 2023, Nurse Lewis discontinued Plaintiff's use of a muscle relaxing medication. That is an unfair characterization of the record. When Plaintiff requested that medication, Nurse Lewis prescribed it for 5 days. That was apparently the limit of her authority. (Kite Response, ECF No. 1-1, PageID.80.) Any long-term prescription required the approval of the pain management committee, a process that took some time. (ECF No. 1-1, PageID.87, 78, 99, 77, 60.) On August 7, 2023, Nurse Lewis informed Plaintiff that her request for long-term use of the muscle relaxer had been denied, but she started Plaintiff on the other medications recommended by the pain management committee. (Administrative Note, ECF No. 1-1, PageID.61.) There is nothing in that sequence of events that supports an inference that Nurse Lewis consciously disregarded Plaintiff's serious medical needs.

The rest of Plaintiff's factual allegations regarding Defendant Lewis's conscious disregard of Plaintiff's serious medical need are focused on events during October and November of 2023,

when he received the injection for his shoulder pain. On October 25, 2023, Plaintiff requested an injection for his shoulder pain (and inquired again about muscle relaxing medication for his neck). (Health Care Request, ECF No. 1-1, PageID.84.) On October 27, Nurse Laitila responded that a chart review was scheduled and that Plaintiff would be receiving the injection. (Kite Response, ECF No. 1-1, PageID.72.) Because nothing had happened by October 31, Plaintiff sent another request. (Health Care Request, ECF No. 1-1, PageID.109.) The next day, Nurse Tatman responded that Plaintiff would receive the injection on November 2. (Kite Response, ECF No. 1-1, PageID.71.) Plaintiff received a schedule with a healthcare callout for November 7. (ECF No. 1-1, PageID.103.) He was not called out that day. Instead he received the injection on November 9.

From Plaintiff's October 25 initial request until he received the injection was 15 days. Plaintiff offers no factual allegations that support an inference that Defendant Lewis was responsible for that delay. Although Plaintiff addressed his healthcare requests to Defendant Lewis, other healthcare providers responded. There is nothing in the documents that suggests that involvement by Defendant Lewis except the callout sheet for November 7. Whatever delay Plaintiff suffered before he received the injection, neither his factual allegations nor the documents support his conclusory assertions that Defendant Lewis was responsible for the delay. Accordingly, the Court concludes that Plaintiff has failed to show that the injection delay reflects Nurse Lewis's conscious disregard of Plaintiff's serious medical needs.

Looking beyond Plaintiff's specific factual allegations to the entirety of the medical record attached to the complaint, it is apparent that Plaintiff received treatment throughout the period at issue in his complaint. Plaintiff may disagree with the course of that treatment, but it simply cannot be said that Defendant Lewis consciously disregarded Plaintiff's serious medical needs. Plaintiff wanted MRIs of his neck and shoulder and he was provided MRIs of his neck and shoulder.

34

Plaintiff wanted surgery on his neck and he received surgery on his neck. Plaintiff wanted pain relieving medications and injections and he received pain relieving medications and injections. It may not have been the exact medication Plaintiff wanted and it may not have been provided as quickly as Plaintiff wanted, but there is nothing in this record that supports Plaintiff's claim that Defendant Lewis ignored his medical needs. This is a dispute about the adequacy of treatment. It does not rise to the level of an Eighth Amendment violation.

## VII.    Sections 1981, 1985, and 1986

Plaintiff makes reference in a heading to 42 U.S.C. §§ 1981, 1985, and 1986.

### A.    42 U.S.C. § 1981

Section 1981 prohibits intentional race discrimination in the making and enforcing of contracts involving both public and private actors and provides a cause of action for race-based employment discrimination. *See* 42 U.S.C. § 1981. In *Jett v. Dallas Independent School District,* 491 U.S. 701 (1989), the Supreme Court held that § 1981 does not itself provide a remedy against state actors. *Id.* at 731. Plaintiff's claims are against a state actor. And, regardless, Plaintiff fails to allege any *facts* showing that he was involved in the making or enforcing of contracts between public and private actors or that he faced race-based employment discrimination. Plaintiff therefore fails to state a claim under § 1981.

### B.    42 U.S.C. §§ 1985 and 1986

Plaintiff also makes passing reference to claims under 42 U.S.C. §§ 1985 and 1986. Section 1985 provides:

(1) Preventing officer from performing duties

If two or more persons in any State or Territory conspire to prevent, by force, intimidation, or threat, any person from accepting or holding any office, trust, or place of confidence under the United States, or from discharging any duties thereof; or to induce by like means any officer of the United States to leave any State, district, or place, where his duties as an officer are required to be performed, or to

35

injure him in his person or property on account of his lawful discharge of the duties of his office, or while engaged in the lawful discharge thereof, or to injure his property so as to molest, interrupt, hinder, or impede him in the discharge of his official duties;

(2) Obstructing justice; intimidating party, witness, or juror

If two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified, or to influence the verdict, presentment, or indictment of any grand or petit juror in any such court, or to injure such juror in his person or property on account of any verdict, presentment, or indictment lawfully assented to by him, or of his being or having been such juror; or if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws;

(3) Depriving persons of rights or privileges

If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985. There are no allegations in Plaintiff's complaint that would support a claim that

any defendant: (1) conspired to prevent an officer of the United States from performing his duty;

(2) conspired to intimidate a participant in a proceeding in a court of the United States or conspired

to interfere with due process in state courts with the intent to deprive persons of their equal protection rights; or (3) conspired to deprive any person of the equal protection of the laws. Plaintiff fails to state a claim under 42 U.S.C. § 1985 and his invocation of the statutory section is frivolous.

"Section 1986 is designed to punish those who aid and abet violations of § 1985." *Haverstick Enters., Inc. v. Fin. Fed. Credit, Inc*., 32 F.3d 989, 994 (6th Cir. 1994) (quoting *Browder v. Tipton*, 630 F.2d 1149, 1155 (6th Cir. 1980)). If a court finds no violation of § 1985, there can be no violation of § 1986. *Id*. Accordingly, Plaintiff has failed to state a claim for violation of § 1986. Plaintiff's § 1986 claim is frivolous as well.

## VIII.   Conspiracy

A civil conspiracy under § 1983 is "an agreement between two or more persons to injure another by unlawful action." *See Hensley v. Gassman*, 693 F.3d 681, 695 (6th Cir. 2012) (quoting *Hooks v. Hooks*, 771 F.2d 935, 943-44 (6th Cir. 1985)). The plaintiff must show the existence of a single plan, that the alleged coconspirator shared in the general conspiratorial objective to deprive the plaintiff of a federal right, and that an overt action committed in furtherance of the conspiracy caused an injury to the plaintiff. *Hensley*, 693 F.3d at 695; *Bazzi v. City of Dearborn*, 658 F.3d 598, 602 (6th Cir. 2011). Moreover, a plaintiff must plead a conspiracy with particularity, as vague and conclusory allegations unsupported by material facts are insufficient. *Twombly*, 550 U.S. at 565 (recognizing that allegations of conspiracy must be supported by allegations of fact that support a "plausible suggestion of conspiracy," not merely a "possible" one); *Fieger v. Cox*, 524 F.3d 770, 776 (6th Cir. 2008); *Spadafore v. Gardner*, 330 F.3d 849, 854 (6th Cir. 2003); *Gutierrez*, 826 F.2d at 1538.

Plaintiff's allegations of conspiracy are wholly conclusory. He alleges no facts that indicate the existence of a plan, much less that the lone Defendant shared a conspiratorial objective with

anyone else. Instead, Plaintiff's allegations, even viewed in the light most favorable to Plaintiff,

describe a number of discrete occurrences over a period of time involving numerous individual

prison healthcare staff. He appears to rely entirely on a highly attenuated inference from the mere

fact that he has been subjected to objectionable treatment by a variety of healthcare providers in

various circumstances. As the Supreme Court has held, such allegations, while hinting at a sheer

"possibility" of conspiracy, do not contain "enough factual matter (taken as true) to suggest that

an agreement was made." *Twombly*, 550 U.S. at 556–57. Instead, the Court has recognized that

although parallel conduct may be consistent with an unlawful agreement, it is insufficient to state

a claim where that conduct "was not only compatible with, but indeed was more likely explained

by, lawful, unchoreographed . . . behavior." *Iqbal*, 556 U.S. at 680 (citing *Twombly*, 550 U.S. at

567). In light of the far more likely possibility that the various incidents occurring over the two-

year period described in Plaintiff complaint and medical record were not the product of some

overarching conspiracy, but just a course of treatment involving many different participants over

time. Plaintiff fails to state a plausible claim of conspiracy.

## IX.    State law claims

Throughout the complaint, Plaintiff refers to state laws, state regulations, and state causes

of action. He describes Defendant Lewis's conduct as medical malpractice. (Compl., ECF No. 1,

PageID.7.) He contends that Defendant Lewis's conduct violated MDOC policy directives. (*Id.*,

PageID.9, 12.) And he references the state statutes regarding the appointment of a director of

corrections, that director's authority to promulgate regulations, and rescinded regulations. (*Id.*,

PageID.11–12.)

Claims under § 1983 can only be brought for "deprivations of rights secured by the

Constitution and laws of the United States." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 924

(1982). Section 1983 does not provide redress for a violation of a state law. *Pyles v. Raisor*, 60

F.3d 1211, 1215 (6th Cir. 1995); *Sweeton v. Brown*, 27 F.3d 1162, 1166 (6th Cir. 1994). Plaintiff's assertion that Defendants violated state laws, regulations, or policy directives or gave rise to state tort claims therefore fails to state a claim under § 1983.

Moreover, to the extent that Plaintiff seeks to invoke this Court's supplemental jurisdiction over a state-law claim, the Court declines to exercise jurisdiction. Ordinarily, where a district court has exercised jurisdiction over a state-law claim solely by virtue of supplemental jurisdiction and the federal claims are dismissed prior to trial, the court will dismiss the remaining state-law claims. *See Experimental Holdings* 503 F.3d at 521 ("Generally, once a federal court has dismissed a plaintiff's federal law claim, it should not reach state law claims." (citing *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966))); *Landefeld v. Marion Gen. Hosp., Inc.*, 994 F.2d 1178, 1182 (6th Cir. 1993). In determining whether to retain supplemental jurisdiction, "[a] district court should consider the interests of judicial economy and the avoidance of multiplicity of litigation and balance those interests against needlessly deciding state law issues." *Landefeld*, 994 F.2d at 1182; *see also Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006) ("Residual jurisdiction should be exercised only in cases where the interests of judicial economy and the avoidance of multiplicity of litigation outweigh our concern over needlessly deciding state law issues." (internal quotations omitted). Dismissal, however, remains "purely discretionary." *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) (citing 28 U.S.C. § 1367(c)); *Orton v. Johnny's Lunch Franchise, LLC*, 668 F.3d 843, 850 (6th Cir. 2012).

Here, the balance of the relevant considerations weighs against the continued exercise of supplemental jurisdiction. Accordingly, Plaintiff's state-law claims will be dismissed without prejudice.

**Conclusion**

Having conducted the review required by the Prison Litigation Reform Act, the Court determines that Plaintiff's federal claims will be dismissed for failure to state a claim, under 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c). The Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims; those claims will be dismissed without prejudice.

The Court must next decide whether an appeal of this action would be in good faith within the meaning of 28 U.S.C. § 1915(a)(3). *See McGore*, 114 F.3d at 611. Although the Court concludes that Plaintiff's claims are properly dismissed, the Court does not conclude that any issue Plaintiff might raise on appeal would be frivolous. *Coppedge v. United States*, 369 U.S. 438, 445 (1962). Accordingly, the Court does not certify that an appeal would not be taken in good faith. Should Plaintiff appeal this decision, the Court will assess the $605.00 appellate filing fee pursuant to § 1915(b)(1), *see McGore*, 114 F.3d at 610–11, unless Plaintiff is barred from proceeding *in forma pauperis*, *e.g.*, by the "three-strikes" rule of § 1915(g). If he is barred, he will be required to pay the $605.00 appellate filing fee in one lump sum.

This is a dismissal as described by 28 U.S.C. § 1915(g).

A judgment consistent with this opinion will be entered.


Dated:    March 18, 2024                              /s/ *Maarten Vermaat*
                                                     Maarten Vermaat
                                                     United States Magistrate Judge